MICHELLE GHAFAR (CA Bar No. 315842)
mghafar@earthjustice.org
(Designated as counsel for service)
RADHIKA KANNAN (CA Bar No. 327733)
rkannan@earthjustice.org
Earthjustice
50 California Street, Suite 500
San Francisco, CA 94111
Tel: (415) 217-2049/ Fax: (415) 217-2040

ELIZABETH B. FORSYTH (CA Bar No. 288311)
eforsyth@earthjustice.org
Earthjustice
810 Third Avenue, Suite 610
Seattle, WA 98104
Tel: (206) 531-0841 / Fax: (206) 343-1526

*Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA
FRESNO DIVISION

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, THE WILDERNESS SOCIETY, FRIENDS OF THE EARTH, AND NATURAL RESOURCES DEFENSE COUNCIL,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. BUREAU OF LAND MANAGEMENT; DEBRA HAALAND, in her capacity as Secretary of the U.S. Department of the Interior; KAREN MOURITSEN, in her capacity as California State Director of the U.S. Bureau of Land Management; GABRIEL GARCIA, in his capacity as the Field Manager of the U.S. Bureau of Land Management; JOHN HODGE, in his capacity as the Assistant Field Manager of Minerals of the U.S. Bureau of Land Management; and CALIFORNIA RESOURCES PRODUCTION CORPORATION dba CALIFORNIA RESOURCE PRODUCTION CORPORATION,<br><br>Defendants. | Civ. No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**INTRODUCTION**

1.     This case challenges the U.S. Bureau of Land Management's ("BLM's") approval of drilling permits for new oil wells on public land in the San Joaquin Valley, California, without accounting for the air quality, groundwater, public health, and climate impacts of BLM's continued expansion of oil and gas drilling, and without providing for meaningful input from the communities most impacted by its permitting decisions.

2.     BLM's failures violate its mandates under the Clean Air Act ("CAA"), the National Environmental Policy Act ("NEPA"), the Federal Land Policy and Management Act ("FLPMA"), the Mineral Leasing Act ("MLA"), and the Freedom of Information Act ("FOIA"). Plaintiffs bring suit under these statutes to stop further harm to San Joaquin Valley communities and the environment.

3.     The San Joaquin Valley is the most polluted air basin in the country, and oil and gas extraction is a major contributor to this pollution. The dirty air has led to devastating health impacts to local Valley communities, where residents currently experience the most asthma-related emergency room visits, heart attacks, and low birth-weight infants in the State of California.

4.     Under both the CAA and NEPA, BLM is obligated to account for this pollution before it can approve any more drilling. Yet for decades, the agency has made the Valley's problems worse by continuously permitting new wells on the public lands it manages within the airshed without complying with these laws.

5.     The CAA requires BLM to evaluate whether air pollution from oil and gas wells it permits will contribute to air quality violations and, if they will, requires BLM to mitigate these emissions. The U.S. Environmental Protection Agency ("EPA") has explained to BLM that to perform this evaluation, it must include a breakout of emissions calculated for each type of equipment and trucks used at well sites, back up its estimates with data, and disclose its assumptions. EPA repeatedly criticized BLM's failure to accurately calculate these emissions from drilling overall when it prepared the "resource management plan" that serves as BLM's blueprint for responsible land use development in the Bakersfield area. To date, BLM has never

remedied these flaws, and the San Joaquin Valley still has no adequate CAA review of BLM's permitting decisions in the region overall, nor any plan for mitigating the pollution impacts.

6.    NEPA also requires BLM to take a "hard look" at the environmental impacts of drilling activity. Courts have repeatedly held that to comply with this hard look mandate, BLM must analyze the cumulative air, water, and climate pollution impacts of the oil and gas drilling it authorizes. The agency should have analyzed these impacts when it prepared the resource management plan for the region, but ultimately failed to do so. BLM is currently back at the drawing board to complete an adequate cumulative impacts analysis for its resource management plan, after settling a lawsuit challenging its failure to do so.

7.    In light of this vacuum of adequate cumulative CAA and NEPA analysis, Plaintiffs have implored BLM to address these deficiencies before granting further drilling permits. Plaintiffs also urged BLM to comply with public participation requirements under NEPA, FLPMA, and the MLA, that require BLM to provide advance notice and opportunity for the public to comment before issuing more drilling permits. Because of the serious flaws in the agency's resource management plan CAA analysis, Plaintiffs' counsel submitted two FOIA requests to BLM seeking the detailed emissions data that EPA flagged as critical to performing an adequate CAA review.

8.    Yet on May 31, 2023, BLM approved six permits to drill new oil wells in the San Joaquin Valley without any meaningful opportunities for the public or EPA to engage beforehand, without responding to the FOIA requests, without supplying the missing cumulative impacts analysis, and with no detailed calculations to justify how the wells will avoid air quality violations.

9.    BLM's relentless permit approvals without due regard for the impacts to air quality, groundwater, public health, and the climate, represent a death by a thousand cuts that federal law is meant to prevent. Plaintiffs therefore bring suit to stop further injury to the public health and the environment in the absence of BLM's compliance with federal law.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    3

**JURISDICTION AND VENUE**

10.     This action arises under the CAA, 42 U.S.C. § 7401 *et seq*., NEPA, 42 U.S.C. § 4321 *et seq*., FLPMA, 43 U.S.C. § 1701 *et seq*., the MLA, 30 U.S.C. § 181 *et seq*., FOIA, 5 U.S.C. § 552, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, which waives the Defendants' sovereign immunity. The Court may issue a declaratory judgment and further relief pursuant to 28 U.S.C. §§ 2201–2202 and 5 U.S.C. §§ 705–706.

11.     Jurisdiction is proper in this Court under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1346 (United States as defendant). An actual justiciable controversy exists between the parties within the meaning of 28 U.S.C. § 2201.

12.     Venue is proper in this district court pursuant to 28 U.S.C. § 1391(e)(1) because officers of the United States are named defendants in their official capacities, and a substantial part of the federal land that is the subject of this action lies in this district. Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(e)(1) because the decision to issue the drilling permits occurred in BLM offices in this district.

13.     Assignment to the Fresno Division of this district court is proper because this case challenges six drilling permits located in Kern County, which is covered by the Fresno Division. L.R. 120(d).

**PARTIES**

14.     Plaintiff Center for Biological Diversity ("the Center") is a nonprofit organization with offices and staff throughout the United States, including in Oakland and Los Angeles, California. The Center works through science, law, and policy to advocate for increased protections for California species and their habitats, a livable climate, and healthy communities by engaging at every step of federal fossil fuel planning, leasing, and development. The Center has over 84,000 members throughout the United States and the world. More than 16,700 members reside in California, some of whom visit the public lands affected by the challenged drilling permits. The Center and its members and staff use public lands in Kern County for recreational, scientific, and aesthetic purposes. They also derive recreational, scientific, and aesthetic benefits from these lands, including through wildlife observation, study, and research. The Center and its

members have an interest in helping to ensure their continued use and enjoyment of the activities on these lands. The Center brings this action on its own behalf and on behalf of its adversely affected members.

15.     Plaintiff The Wilderness Society ("TWS") is a nonprofit organization, whose mission is to unite people to protect America's wild places. TWS is one of America's leading public lands conservation organizations. Since 1935, TWS has been dedicated to protecting America's wild places for current and future generations. TWS contributes to better protection, stewardship, and restoration of public lands, preserving the nation's rich natural legacy for current and future generations. TWS is committed to smart and sensible regulation and management of our public lands, ensuring that our public lands are part of the solution to climate change. TWS frequently engages in BLM land use planning and project proposals, including engagement with the drilling permits at issue. TWS has offices throughout the country, including in Oakland and Pasadena, California. TWS has 25,626 members in California and over one million members and supporters nationwide. TWS members and staff have visited and recreated in the public lands within Kern County.

16.     Plaintiff Friends of the Earth ("FOE") is a tax-exempt, 501(c)(3) organization and a not-for-profit corporation. It has offices in Washington, D.C. and Berkeley, California. FOE is a membership organization consisting of over 244,000 members, including more than 35,000 members who live in California. Additionally, FOE has more than 6.6 million activist supporters on its email list throughout the United States. It is also a member of FOE International, which is a network of grassroots groups in seventy-four countries worldwide. Its mission is to protect our natural environment, including air, water, and land, and to achieve a healthier and more just world, using public education, advocacy, legislative processes, and litigation. FOE is concerned about the adverse environmental and socioeconomic impacts from climate change and fossil fuel extraction, including harms to air quality, climate, imperiled species, the health of local communities, and precious groundwater resources. Therefore, on behalf of its members and activists, FOE's Fossil Fuels Program actively engages in advocacy to curb new oil and gas leases on public lands and waters throughout the United States as well as influence policy and law

1  governing fossil fuel development. FOE brings this action on its own behalf and on behalf of its

2  adversely affected members.

3      17.    Plaintiff Natural Resources Defense Council ("NRDC") is a nonprofit

4  environmental membership organization that uses law, science, and the support of more than

5  375,000 members throughout the United States to protect wildlife and wild places and to ensure a

6  safe and healthy environment for all living things. Over 66,000 of NRDC's members reside in

7  California, with more than 200 of those residing in Kern County. NRDC has a long-established

8  history of working to protect public lands, ensure proper oversight of oil and gas production

9  activities, reduce the environmental harm associated with oil drilling, and address climate change

10  by promoting clean energy and reducing America's reliance on fossil fuels. NRDC members who

11  live in or near Kern County will be adversely impacted by new oil and gas drilling and

12  development, as will those who recreate in affected areas.

13      18.    Individual Plaintiffs and Plaintiff groups' boards, staff, and members live, work,

14  and recreate in and around the federal lands at issue in this case. They will be adversely affected

15  and irreparably harmed by BLM's issuance of the drilling permits. Plaintiffs' boards, staff, and

16  members intend to continue to use and enjoy the public lands affected by the challenged drilling

17  permits for recreation, scientific research, aesthetic pursuits, and spiritual renewal frequently and

18  on an ongoing basis in the future.

19      19.    Oil development pursuant to the drilling permits will degrade air quality and

20  pollute and consume precious water resources used and enjoyed by Plaintiffs and their members.

21  Oil development will also harm Plaintiffs and their members by increased emission of pollutants

22  responsible for climate change. All of these harms will diminish Plaintiffs' health and safety and

23  ability to enjoy the recreational, spiritual, professional, aesthetic, educational, and other activities

24  in and around the lands at issue in the challenged drilling permits.

25      20.    Additionally, Plaintiffs and their respective boards, staff, and members have a

26  substantial interest in ensuring that BLM complies with all applicable laws, including the

27  procedural requirements of the CAA, NEPA, FLPMA, the MLA, FOIA, and APA. Plaintiffs the

28  Center, TWS, and NRDC participated extensively in BLM's decision-making around the

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF        6

Bakersfield resource management plan and its most recent oil and gas lease sale in the Bakersfield area. Plaintiff FOE participated extensively in BLM's decision-making around the recent Bakersfield lease sale. All Plaintiffs also participated extensively in BLM's administrative process for the drilling permits. Plaintiffs have exhausted their administrative remedies.

21.    Plaintiffs' injuries are actual and concrete and would be redressed by the relief sought herein. Plaintiffs have no adequate remedy at law.

22.    Defendant BLM is an administrative agency within the United States Department of the Interior, responsible for managing federal lands and subsurface mineral estates underlying federal, state, and private lands across the United States, including the land and mineral estate that is at issue in the challenged drilling permits, and in that capacity is responsible for implementing and complying with applicable laws and regulations.

23.    Defendant Debra Haaland is sued in her official capacity as the Secretary of the United States Department of the Interior. As Secretary, Ms. Haaland is the official ultimately responsible for managing federal public lands and resources and in that capacity is responsible for implementing and complying with applicable laws and regulations.

24.    Defendant Karen Mouritsen is sued in her official capacity as the State Director of BLM in California. As State Director, Ms. Mouritsen is the official ultimately responsible for managing California's federal public lands and resources and in that capacity is responsible for implementing and complying with applicable laws and regulations.

25.    Defendant Gabriel Garcia is sued in his official capacity as the BLM Bakersfield Field Manager. As Field Manager, Mr. Garcia is the official responsible for permitting oil drilling in the Bakersfield planning area – approximately 1.2 million acres of federal mineral estate, covering eastern Fresno, western Kern, Kings, Madera, San Luis Obispo, Santa Barbara, Tulare, and Ventura counties.

26.    Defendant John Hodge is sued in his official capacity as the BLM Bakersfield Assistant Field Manager for Minerals. As Assistant Field Manager for Minerals, Mr. Hodge is the official responsible for reviewing staff recommendations on the proposed action, reviewing the

environmental assessment for the drilling permits at issue, considering and rejecting alternatives, and ultimately approving the proposed action.

27.    Defendant California Resource Production Corporation ("CRPC") is the listed entity that requested and received the six drilling permits at issue in this case. As named, this entity is not registered to do business in California.

28.    Defendant California Resources Production Corporation, on information and belief, is doing business as California Resource Production Corporation. California Resources Production Corporation is a Delaware corporation authorized to do business in California and on information and belief is the corporation in receipt of the drilling permits at issue.

29.    Plaintiffs permissively join Defendant California Resources Production Corporation dba California Resource Production Corporation, pursuant to Federal Rule of Civil Procedure 20 because the relief requested by Plaintiffs is asserted against CRPC jointly with BLM, and Plaintiffs' right to relief arises out of the same transaction, i.e. the six drilling permits issued by BLM to CRPC. Fed. R. Civ. P. 20(a)(2)(A).

STATUTORY BACKGROUND

**I. Clean Air Act**

30.    The CAA establishes a comprehensive program for controlling and improving the nation's air quality through shared federal and state responsibility. The CAA authorizes EPA to establish National Ambient Air Quality Standard ("NAAQS") for pollutants deemed by EPA to be "criteria" pollutants. 42 U.S.C. §§ 7407–7410.

31.    States are required to submit a State Implementation Plan ("SIP") to EPA that regulates the states' fulfillment of the CAA and enforcement of the NAAQS. *Id.* § 7410(a)(2). EPA designates areas which fail to attain a NAAQS standard as "nonattainment areas." *Id.* § 7407(d)(1).

32.    Section 176(c)(1) of the CAA provides that no federal agency shall "engage in, support in any way or provide financial assistance for, license or permit, or approve, any activity which does not conform to [a SIP]." *Id.* § 7506(c)(1). Federal activities must not:

(i)    cause or contribute to any new violation of any standard in any area;

(ii)    increase the frequency or severity of any existing violation of any standard in any area; or

(iii)    delay timely attainment of any standard of any required interim emission reductions or other milestones in any area. *Id.*

33.    This is referred to as the "conformity" requirement (or the General Conformity Rule). A conformity determination is required for each criteria pollutant or precursor in a nonattainment or maintenance area where the total emissions caused by a federal action would equal or exceed the rates provided in the regulations. 40 C.F.R. § 93.153(b).

34.    Federal law prescribes a two-step process to conduct conformity review of federal actions. First, an agency must determine whether its action will result in emissions exceeding a certain threshold (or *de minimis* level). *Id.* Second, if the threshold requirement is met, the agency must prepare a full "conformity determination" and mitigate the project's emissions so that the project does not impair a region's ability to implement its plan for improving air quality. *Id.* § 93.152.

35.    To determine whether a project's emissions are *de minimis*, the federal agency must show that total direct and indirect emissions, combined, are below the region's stipulated thresholds. Environmental Protection Agency, General Conformity Training Module (2010), https://www.epa.gov/sites/default/files/2016-03/documents/general_conformity_training_manual.pdf.

36.    Direct emissions are those that are caused by the action and indirect emissions are those that may be separated by time or space but are of the type that "the agency can practically control" and for which "the agency has continuing program responsibility." *Id.*

37.    All emissions must be "reasonably foreseeable," which means that they may be calculated based on reasonable assumptions regarding techniques and equipment to be used. *Id.* The portion of a project's emissions that must be permitted or are otherwise presumed to conform may be excluded from the *de minimis* calculations. *Id.*; 40 C.F.R. § 93.153(d)(1).

## II. National Environmental Policy Act

38.     NEPA is "our basic national charter for protection of the environment." *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1166 (9th Cir. 2003) (quoting *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208 (9th Cir. 1998)). The Fiscal Responsibility Act ("FRA") amended NEPA on June 3, 2023. However, because Plaintiffs' comments and challenges to BLM's approval of drilling permits began prior to FRA's enactment, the pre-FRA NEPA requirements apply.

39.     NEPA's goals are to (1) "prevent or eliminate damage to the environment and biosphere," (2) "stimulate the health and welfare" of all people, and (3) "encourage productive and enjoyable harmony between [hu]man[kind] and [the] environment." 42 U.S.C. § 4321.

40.     To fulfill these purposes, NEPA requires that: (1) agencies take a "hard look" at the environmental impacts of their actions before the actions occur, thereby ensuring "that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts," and (2) "the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

41.     A hard look includes evaluating the "cumulative effects" of the action— "the environment that result from the incremental effects of the action when added to the effects of other past, present, and reasonably foreseeable actions." 40 C.F.R. § 1508.1(g)(3). "Cumulative effects can result from individually minor but collectively significant actions taking place over a period of time." *Id*. Agencies must provide quantified or detailed information of how past, present, and future projects will combine with the proposed project to impact the environment.

42.     NEPA also requires an agency to prepare a detailed statement regarding the alternatives to a proposed action. *See* 42 U.S.C. § 4332(C)(iii), (E). Consideration of reasonable alternatives is necessary to ensure that the agency has taken into account all possible approaches to, and potential environmental impacts of, a particular project.

43.    "General statements about 'possible' effects and 'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided." *Neighbors of Cuddy Mountain v. U.S. Forest Serv*., 137 F.3d 1372, 1380 (9th Cir. 1998).

44.    NEPA requires federal agencies to prepare an environmental impact statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C).

45.    To help determine whether an EIS is necessary, an agency may first prepare an environmental assessment ("EA"). 40 C.F.R. § 1501.5. If the agency determines, after preparing the EA, that the proposed action does not require preparation of an EIS, it must then prepare a finding of no significant impact ("FONSI") detailing why the action "will not have a significant effect on the human environment." *Id*. § 1501.6(a); see *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin*., 538 F.3d 1172, 1185 (9th Cir. 2008) (describing procedure). If the EA indicates that the federal action "may" significantly affect the quality of the human environment, the agency must prepare an EIS. *See*, *e.g*., *Anderson v. Evans*, 371 F.3d 475, 488 (9th Cir. 2004).

46.    All environmental analyses required by NEPA must be conducted "at the earliest possible time." *Kern v. U.S. Bureau of Land Mgmt*., 284 F.3d 1062, 1072 (9th Cir. 2002) ("NEPA is not designed to postpone analysis of an environmental consequence to the last possible moment. Rather, it is designed to require such analysis as soon as it can reasonably be done.").

47.    Public participation is integral to NEPA to ensure that "the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson*, 490 U.S. 332 at 349. NEPA therefore requires agencies to "provide public notice of NEPA-related hearings, public meetings, and other opportunities for public involvement, and the availability of environmental documents so as to inform those persons and agencies who may be interested or affected by their proposed actions." NEPA also requires "in all cases" the agency to "notify those who have requested notice on an individual action." 40 C.F.R. § 1506.6(b).

### III. Federal Land Policy and Management Act

48.    FLPMA governs the management, protection, development, and enhancement of federal property under BLM's jurisdiction.

49.    Under FLPMA, BLM, in its decisions about whether and how to approve new permits to drill for oil, must: (1) protect public land values, including air and atmospheric values, 43 U.S.C. § 1701(a)(8); (2) account for "the long-term needs of future generations," *Id*. § 1702(c); (3) prevent "permanent impairment of the productivity of the land and quality of the environment," *Id*. § 1702(c); and (4) "take any action necessary to prevent unnecessary or undue degradation of the lands," *Id*. § 1732(b).

50.    FLPMA also requires BLM to comply with all applicable air quality standards, including those found in the CAA, as described above, in land use planning and when authorizing activities. *Id*. § 1712(c)(8); 43 C.F.R. § 2920.7(b)(3).

51.    Like NEPA, FLPMA requires public participation. Section 309(e) of FLPMA requires BLM to "give . . . the public adequate notice and an opportunity to comment upon . . . and to participate in . . . the management of[] the public lands." 43 U.S.C. § 1739(e).

### IV. The Mineral Leasing Act

52.    Under the MLA, the Secretary of the Interior is responsible for managing and overseeing mineral development on public lands, not only to ensure safe and fair development of the mineral resource, but also to "safeguard[] . . . the public welfare." 30 U.S.C. § 187.

53.    The MLA also requires public participation in drilling permits, specifying that BLM must provide the public the "terms" of a drilling permit, as well as "maps or a narrative description of the affected lands," at least 30 days before issuing the permit. *Id*. § 226(f). Such maps must "show the location of all tracts to be leased, and of all leases already issued in the general area." *Id*.

### V. Freedom of Information Act

54.    FOIA's fundamental purpose is transparency and openness in government.

55.    FOIA gives any person the right to request access to records of agencies within the executive branch of the U.S. government and requires an agency to respond within 20 working

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    12

days by making reasonable efforts to determine whether responsive records exist and whether the agency will release them. 5 U.S.C. § 552 (a)(6)(A)(i), (a)(3)(C)–(D).

56.     If an agency fails to notify a FOIA requester before the statutory deadline of the agency's determination about whether it will comply with a request, the requester is deemed to have exhausted its administrative remedies and may immediately seek review in an appropriate district court. *Id*. § 552(a)(6)(C)(i), (a)(4)(B).

57.     FOIA's fundamental purpose is transparency and openness in government. EPA specifically recommends that "if a person or agency believes that [a Federal agency performing Clean Air Act conformity review] is not being forthright in their calculation of total emissions," then that information can be requested through FOIA. Environmental Protection Agency, General Conformity Guidelines: Questions and Answers (1994), https://www.epa.gov/sites/default/files/2016-03/documents/gcgqa_940713.pdf.

58.     If an agency fails to notify a FOIA requester before the statutory deadline of the agency's determination about whether it will comply with a request, the requester is deemed to have exhausted its administrative remedies and may immediately seek review in an appropriate district court. 5 U.S.C. § 552(a)(6)(C)(i), (a)(4)(B).

59.     FOIA empowers this Court to "enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." *Id*. § 552(a)(4)(B).

**VI. Administrative Procedure Act**

60.     The APA provides a right to judicial review for any "person suffering legal wrong because of agency action." 5 U.S.C. § 702. Actions that are reviewable under the APA include final agency actions "for which there is no other adequate remedy in a court." *Id*. § 704.

61.     Under the APA, a reviewing court shall, *inter alia*, "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id*. § 706(2)(A). Agency actions may also be set aside in other circumstances, such as where the action is "without observance of procedure required by law." *Id*. § 706(2)(B)–(F).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    13

**FACTUAL BACKGROUND**

**I. The San Joaquin Valley and the Environmental Impacts of Oil Drilling**

62.     The San Joaquin Valley air basin is home to our nation's greatest air quality challenges. The Valley maintains the worst designation for ozone pollution in the country.

63.     Ozone is a colorless, odorless reactive gas comprised of three oxygen atoms. It is formed by the chemical reaction between nitrogen oxides ("NOx") and volatile organic compounds ("VOCs") in the presence of sunlight.

64.     The San Joaquin Valley's nonattainment designation means that the threshold for what constitutes a "major source" of air pollution under the CAA is relatively low compared to other parts of the country—only 10 tons per year each of the ozone precursors NOx and VOC.

65.     In fact, BLM notes that Kern County exceeds the safe thresholds for ozone and particulate matter on almost one-third of all days in the year and that such poor air quality presents health risks to residents. Environmental Assessment for California Resource Production Corporation Mount Poso; 6 Applications for Permit to Drill DOI-BLM-CA-C060-2022-0112-EA Programmatic Project #136 (hereinafter "EA") at 21.

66.     The American Lung Association found Bakersfield, a city in Kern County in the San Joaquin Valley, to be the most polluted city in the nation by year-round particle pollution, the most polluted by daily particle pollution, and the third-most polluted by ozone.

67.     Despite growing concerns over the lasting impacts that air pollution will have on community members in the San Joaquin Valley, BLM continues to authorize drilling in the region – the Valley continues to produce 75 percent of California's crude oil and maintain over 83 percent of the state's active wells, which cause significant air pollution.

68.     Several of the largest and most carbon-intensive oil fields in the country are also located in the Valley, particularly Kern County. At every stage of oil extraction, pollutants are released that exacerbate NAAQS violations in the Valley air basin, cause adverse health effects to communities, and worsen the consequences of climate change.

69.     The process of oil extraction involves industrial procedures that emit significant amounts of these pollutants. Indeed, these emissions have increased significantly over time in the air basin in part due to oil and gas development.

70.     Specifically, in oil operations, NOx emissions arise from drilling, workovers, and general use trucks. Emissions of VOCs are also highly impacted by oil extraction, and in fact the oil and natural gas industry is the largest source of industrial VOCs in the country.

71.     Pollution in the San Joaquin Valley air basin has worsened so much that NOx emissions are now visible from space—a development that can be largely attributed to an increase in oil and gas operations. By 2035, oil and gas production could be the largest source of NOx in Kern County, accounting for seventy percent of all emissions.

72.     One study estimates VOC emissions from oil and gas extraction in the San Joaquin Valley as akin to total transportation emissions in the region. This suggests that petroleum operations are responsible for significant amounts of criteria pollutants in the San Joaquin Valley.

73.     These emissions have real health impacts on people living in the San Joaquin Valley. According to the American Lung Association, "[i]f you live in Kern County, the air you breathe may put your health at risk." Air pollution resulting from oil drilling and production is associated with respiratory and neurological issues, cardiovascular damage, endocrine disruption, birth defects in babies, cancer, and premature mortality. The EPA's National-Scale Air Toxics Assessment indicates that the respiratory hazard index in Kern County is higher than 95 percent of the nation and the cancer risk is higher than 75 percent of the nation.

74.     The above-described air quality problems are expected to worsen over the years as the impacts of climate change aggravate dangerous weather patterns. The San Joaquin Valley is expected to see more hot days, which will cause an increase in ground-level ozone formation. Additionally, as air quality worsens with climate change, the community will be subjected to worsening drought conditions.

75.     California, and Kern County in particular, also faces extreme water scarcity. Kern County receives an average of less than six inches of rainfall per year, which means that surface water supplies do not meet the needs of the region. Therefore, the County is forced to rely on a

complicated system of importing water and pumping/storing groundwater. Kern County has already spent hundreds of millions of dollars to invest in a groundwater banking system that is responsible for providing most of the County's potable water to its residents.

76.    The San Joaquin Valley also has the biggest imbalance between groundwater pumping and replenishment in the state. As climate change and the accompanying droughts continue to worsen, so will surface water scarcity and pressure on groundwater resources. This trend is already visible, as groundwater overdraft in the San Joaquin Valley has accelerated in recent years.

77.    Kern County also experiences severe drinking water contamination problems. Kern County has the second highest number of community water systems in California that rely on contaminated groundwater, and residents are already forced to rely on contaminated drinking water because the community water systems in Kern County are small and lack the resources to properly treat the groundwater or use another uncontaminated water source.

78.    Oil and gas production requires large volumes of water, and the Kern sub-basin is already a critically overdrawn aquifer. The oil and gas industry's increasing demand for water threatens the water sources for the small communities and domestic users in Kern County that rely on local groundwater.

79.    Drilling also threatens to contaminate precious groundwater resources in the area through the disposal and reinjection of produced water—waste fluid that is produced from a well for the life of the well, and which must be separated and disposed.

80.    Wastewater management from oil and gas drilling can also contaminate groundwater. Wastewater from the wells may be used for the Pyramid Hill waterflood injection project. Waterflooding operations, when used for enhanced oil recovery, have their own host of groundwater contamination issues.

81.    Injection of wastewater into underground injection wells also poses a threat. Oil operators in the San Joaquin Valley frequently dispose of waste fluids by using underground injection wells. But oftentimes, those injection wells allow injection of waste fluids directly into

aquifers that may contain usable water, or into aquifers hydrologically connected to usable water, thereby contaminating the water supply.

82.    Climate change makes it even more important to protect potentially usable sources of groundwater. The warming climate is expected to increase demand for groundwater in coming years, putting greater pressure on current sources, and requiring water from previously untapped groundwater sources.

83.    Worse, oil and gas production and combustion dominate as significant sources of greenhouse gas emissions and are primary drivers of climate change. Continued drilling only creates a reinforcing loop of worsening air quality and water scarcity.

84.    These problems are all interrelated and cannot be assessed in a vacuum. As air and water quality deteriorates for community members in the Valley, so too will their ability to face continued risk of illness and drought.

**II. The Process of Oil and Gas Permitting on Public Land**

85.    Under the MLA and FLPMA, BLM manages oil and gas drilling on public lands using a three-stage process.

86.    In the first stage, BLM prepares, with public involvement, a "resource management plan" for each unit of public land within its jurisdiction. 43 U.S.C. § 1712(a). A resource management plan operates like a zoning plan, defining the allowable uses of public lands within the plan area. At the resource management plan stage, BLM generally determines what areas to make available for oil and gas leasing and under what conditions. *N.M. ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 689 n.1 (10th Cir. 2009) (describing process).

87.    A resource management plan does not require leasing any specific lands. BLM typically prepares an EIS evaluating, in general terms, the expected environmental impacts of potential land management decisions, including oil and gas development.

88.    In the second stage, oil and gas operators submit an "expression of interest" to nominate specific sites within the plan area for oil and gas leasing. 43 C.F.R. § 3120.1-1(e). BLM then decides whether those lands are eligible and, if so, makes them available through a

1  competitive leasing process, subject to the requirements of the resource management plan. 43

2  U.S.C. § 1712(e); 43 C.F.R. § 1610.5-3(a); 43 C.F.R. Part 3120.1 *et seq*. Prior to sale, BLM

3  typically prepares an environmental review evaluating the environmental impacts of the lease

4  sale. BLM may also subject leases to terms and conditions—for example, in the form of lease

5  "stipulations"—to protect the environment.

6      89.    In the third and final stage, which occurs after BLM holds the lease sale and issues

7  the leases, lessees submit applications for drilling permits to BLM. 43 C.F.R. § 3162.3-1(c).

8      90.    The drilling permit stage represents a critical step in this process because it is the

9  last and final step of the federal permitting process before a permittee can begin ground

10  disturbance.

11  **PROCEDURAL BACKGROUND**

12  **I. Plaintiffs' Ongoing Challenge to BLM's Resource Management Plan and Lease**

13  **Sale**

14      91.    Plaintiffs' current challenge is not the first time a court has been asked to step in to

15  stop BLM from authorizing an expansion of oil and gas drilling on public lands in California

16  without accounting for air and water pollution, health, and climate impacts.

17      92.    Adopted in 2014, the Bakersfield resource management plan opened over 1

18  million acres of public land and mineral estate in central California to leasing and drilling

19  activity. In 2016, the Central District of California concluded that BLM failed to properly analyze

20  the impacts of hydraulic fracturing (or "fracking," a risky oil and gas stimulation technique

21  whereby large volumes of fluid is injected down an oil or gas well under pressure great enough to

22  fracture the surrounding rock formation) authorized in the plan. *ForestWatch v. U.S. Bureau of*

23  *Land Mgmt*., No. CV-15-4378-MWF, 2016 WL 5172009, at *11–12 (C.D. Cal. Sept. 6, 2016). As

24  a result of that litigation, BLM agreed to complete supplemental NEPA analysis to address the

25  deficiencies identified by the court.

26      93.    On April 26, 2019, BLM released a draft supplemental environment impact

27  statement ("SEIS") for the Bakersfield resource management plan. In the Draft SEIS, BLM

28

determined that estimated emissions from the resource management plan fell below *de minimis* levels, and therefore did not necessitate performing a CAA conformity review.

94.     In public comments on the Draft SEIS for the management plan, EPA pointed out that "the emission estimates presented in the [Draft SEIS] are used to demonstrate that emissions are below the *de minimis* levels for General Conformity. However, the necessary calculations are not in the Draft SEIS and the format of the details of the emission calculations in Appendix E of the EIR do not allow for a full understanding of the emissions." The agency recommended that "BLM supplement the current information with those details to support the conclusion that a Conformity Determination is not required." EPA explained to BLM that to support a conformity determination, BLM must provide "detailed emissions calculations" including, among other factors, "a breakout of emissions calculated for individual equipment and area sources, as well as emissions estimates for transportation (e.g., number of truck trips for set-up, fracturing, take-down)" and an explanation of "emission factors and required horsepower (hp) for all equipment."

95.     In additional public comments on the Final SEIS, EPA noted BLM had failed to include the requested analysis, and that "EPA's concerns identified in our [Draft SEIS] comment letter remain." The agency went on to stress the need for a cumulative air impacts analysis of BLM's authorized oil and gas drilling for the region and requested the opportunity to confer with BLM at the drilling permits stage "to ensure that air quality analyses are adequate and address our [Draft SEIS] comments and to assist the BLM in ensuring that the requirements of General Conformity have been met."

96.     To date, BLM has never remedied these flaws, and the San Joaquin Valley still has no adequate CAA review of BLM's permitting decisions in the region overall, nor any mitigation plan for lessening the pollution impacts.

97.     Because the Final SEIS failed to respond to extensive public comments and still failed to confront significant impacts of fracking on air quality, water, climate, and the health of nearby environmental justice communities, a diverse coalition of environmental justice, conservation, and business groups once again brought suit in the Central District. *Ctr. for*

*Biological Diversity v. U.S. Bureau of Land Mgmt.*, No. 2:20-CV-00371 DSF (C.D. Cal., filed Jan. 14, 2020).

98.     In December 2020, before the Central District could resolve the ongoing challenge to BLM's inadequate NEPA review for its resource management plan, the agency barreled ahead with a lease sale in Kern County. This was the first lease sale in California in eight years, selling 4,133 acres of public land near Bakersfield. Because BLM's analysis of the sale's impacts relied on the deficient analysis in the Final SEIS for the resource management plan, community groups and environmental organizations also challenged the lease sale. *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.*, No. 1:21-cv-00475-DAD-SAB (E.D. Cal., filed March 22, 2021).

99.     BLM opened settlement discussions in both the challenge to the Final SEIS and the challenge to the 2020 lease sale and, after a year and a half of negotiations, finalized agreements with a variety of commitments from BLM, including: new supplemental analyses for the Bakersfield resource management plan and 2020 lease sale, improved public participation requirements that include Spanish translation and interpreters, and no new lease sales or permits to drill on the leases it recently sold until the new analyses are complete. Pursuant to the settlement agreements, BLM has gone back to the drawing board to redo its inadequate NEPA review for the Bakersfield area. The agency is still studying the environmental impacts of the Bakersfield resource management plan and 2020 lease sale and, as a result, there is currently no completed environmental review of the cumulative impacts of BLM's oil and gas permitting decisions in the San Joaquin Valley.

100.     So as to provide meaningful input before BLM issues additional drilling permits, both EPA and Plaintiffs requested that BLM provide its environmental review documents for any additional drilling permits for public comment before approving them.

**II. FOIA Requests**

101.     On April 27, 2021, Counsel for Plaintiffs submitted a FOIA to BLM requesting its CAA conformity determinations for drilling permits the agency issued in 2020 and 2021, including but not limited to underlying data, calculations, assumed emissions sources, assumed

equipment specifications, and manufacturers information. BLM never responded to this FOIA request.

102.    On May 5, 2023, Counsel submitted a FOIA request on behalf of Plaintiff Center for Biological Diversity requesting the following information for the six wells at issue in this case:

(a)    All underlying information supporting BLM's CAA conformity determination, including but not limited to underlying data, calculations, worksheets, assumed emissions sources, assumed equipment specifications and manufacturers, assumed equipment efficiency and controls, assumed emissions factors, assumed activity levels, assumed load factors, assumed well depth and direction, and the basis for all assumptions;

(b)    All records reflecting communications between BLM and the project applicants concerning the emissions of criteria pollutants;

(c)    All records reflecting communications between BLM and EPA concerning the emissions of criteria pollutants;

(d)    Any guidance documents relied on by BLM in performing CAA conformity determinations;

(e)    Any actual field test data or other records of verification of actual criteria emissions from previously approved drilling permits.

103.    BLM has not responded to this FOIA request.

**III. The Drilling Permits in Issue**

104.    In this vacuum of an adequate environmental review at previous stages of managing public lands in the region, and after failing to respond to FOIA requests, BLM has nonetheless continued to issue permits to companies to drill for oil.

105.    In July 2022, California Resource Production Corporation submitted six applications for permits to drill near Bakersfield in Kern County.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    21

106.    The proposed drilling would occur within the Mount Poso oil field and include the expansion and grading of five existing well pads and the construction of one additional pad, the installation of associated power poles and pipelines, and the drilling of six new wells.

107.    BLM's notice of the permits provided almost no information on the proposed drilling activity, including no information about the "terms" of the drilling or information on "other oil and gas leases already issued in the general area." 30 U.S.C. § 226(f).

108.    The agency did not provide a draft EA, and it did not inform the public of an opportunity to comment. BLM did not provide notice to Plaintiffs or EPA.

109.    On August 29, 2022, without the benefit of a formal public comment period and without seeing a draft of the EA, Plaintiffs in this case submitted detailed comments on BLM's proposed approval of the drilling permits.

110.    With respect to public process, Plaintiffs asked the agency to provide a minimum 30-day comment period for the EA or EIS for the drilling permits, to ensure proper public participation.

111.    With respect to air quality, Plaintiffs explained that BLM has never undertaken a meaningful CAA conformity review for oil and gas development in the San Joaquin Valley. Like EPA, Plaintiffs explained the need for detailed calculations to support BLM's conformity determination and the need to account for cumulative emissions. Plaintiffs noted that using the per well emissions estimates in EAs from other BLM field offices, between two to three oil wells constitute a "major source" of air pollution under the CAA. Similarly, Plaintiffs also noted that according to Kern County's per well emissions estimates, typically three to four oil wells would constitute a "major source" of air pollution. Plaintiffs explained that BLM is required under NEPA to evaluate cumulative air emissions.

112.    With respect to public health, Plaintiffs noted the dire public health threats from oil drilling in the San Joaquin Valley and urged BLM to evaluate the cumulative impacts of adding additional pollution from oil drilling into the already pollution-burdened area.

113.    With respect to climate change, Plaintiffs explained that BLM must consider the cumulative climate change impacts from the drilling permits and to consider an alternative

consistent with a managed decline of production rates and greenhouse gas pollution that will avoid catastrophic warming.

114.    With respect to water, Plaintiffs explained that BLM must analyze the cumulative water quality and scarcity impacts from the drilling permits. Plaintiffs specifically highlighted the need for BLM to analyze the impacts of wastewater on water quality, including whether the operator's use of underground injection of wastewater may impact drinking water.

115.    Without providing a draft EA for review for EPA or the public, and without responding to Plaintiffs' FOIA requests, BLM approved the six drilling permits on May 31, 2023. BLM did not notify Plaintiffs or EPA of its decision to issue the permits.

116.    BLM released its EA and the Decision Record approving the permits on the same day – May 31, 2023.

117.    With respect to air quality, in the EA for the six permits at issue, BLM prepared a short table that lists total air emissions estimates for the wells in a maximum year and average year, including for particulate matter and the ozone precursors VOC and NOx across the development, production, mid-stream, and downstream stages.

118.    BLM calculated total maximum year emissions for six wells across all stages at a miniscule 0.553 tons of VOC (or 0.09 tons per well) and 0.053 tons of NOx (or 0.009 tons per well). Concluding that these emissions are below the de minimis thresholds of 10 tons each for VOC and NOx, BLM concluded no formal conformity determination is required and ended its analysis there.

119.    Nowhere in its emissions table, or in the EA more generally, did BLM provide the underlying data or sources for the data to support its emissions calculations. BLM did not explain how its emissions estimates are orders of magnitude lower than other BLM field offices or Kern County. And BLM did not justify its decision to permit these six wells without any analysis of whether they are segmented from other oil and gas drilling activities that BLM has permitted.

120.    With respect to public health, the EA did not take a hard look at the cumulative public health and environmental justice impacts from BLM's authorization of oil drilling in the San Joaquin Valley.

121.    With respect to water, the EA did not undertake a cumulative water scarcity analysis nor explain how underground injection of wastewater may impact drinking water.

122.    With respect to climate change, the EA entirely failed to quantify cumulative greenhouse gas emissions on a regional or national scale or allow for informed choices between alternatives including managed fossil fuel production decline on public land.

123.    Despite NEPA's instruction to "rigorously explore and objectively evaluate all reasonable alternatives," the EA evaluated only two alternatives: the proposed action and a no action alternative. 40 C.F.R. § 1502.14(a). The EA also made no attempt to evaluate the managed decline of fossil fuel on public lands in approving six drilling permits, or any other reasonable alternatives and mitigation strategies that would limit climate impacts.

124.    The reasonably foreseeable oil drilling permits BLM issues in the Bakersfield plan area, along with other drilling permits issued at the local level by Kern County and the state level by California's Geologic Energy Management Division, have cumulatively significant impacts on the environment, including exceedances of NAAQS, contamination of groundwater, and on climate change.

125.    Plaintiffs now bring this challenge to ensure BLM takes a hard look at the impacts of the oil and gas activity it is authorizing and considers reasonable alternatives, before approving additional drilling permits.

### FIRST CLAIM FOR RELIEF

### Violation of the Clean Air Act

(On Behalf of All Plaintiffs)

126.    Plaintiffs re-allege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

127.    BLM's determination that the emissions from the six wells are *de minimis* and that BLM therefore does not need to conduct conformity review under the CAA is arbitrary and capricious because BLM: (1) fails to substantiate its *de minimis* determination; (2) fails to conduct a cumulative assessment of air emissions from other permits it has authorized; (3) fails to respond to comments explaining why these calculations are necessary; and (4) fails to explain

1  how BLM's conclusions are inexplicably orders of magnitude smaller than comparable per well

2  emissions calculations projected by Kern County and other BLM field offices.

3      128.    BLM's failure to conduct a conformity review violates the CAA. *See* 42 U.S.C. §

4  7506(c)(1); 40 C.F.R. § 93.153(b); 43 U.S.C. § 1712(c)(8); 43 C.F.R. § 2920.7(b)(3).

**SECOND CLAIM FOR RELIEF**

**Violation of NEPA Public Participation Requirements**

(On Behalf of All Plaintiffs)

8      129.    Plaintiffs re-allege, as if fully set forth herein, each and every allegation contained

9  in the preceding paragraphs.

10      130.    NEPA's purpose is to ensure that an agency, "in reaching its decision, will have

11  available, and will carefully consider, detailed information concerning significant environmental

12  impacts; it also guarantees that the relevant information will be made available to the larger

13  audience that may also play a role in both the decision-making process and the implementation of

14  that decision." *Robertson*, 490 U.S. at 349. Thus, the Ninth Circuit has explained that "[a]n

15  agency, when preparing an EA, must provide the public with sufficient environmental

16  information, considered in the totality of circumstances, to permit members of the public to weigh

17  in with their views and thus inform the agency decision-making process." *Bering Strait Citizens*

18  *for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs*., 524 F.3d 938, 953 (9th Cir. 2008).

19      131.    BLM's failure to give the public adequate information concerning environmental

20  impacts of the wells to allow the public to weigh in is contrary to NEPA and its implementing

21  regulations and therefore is arbitrary, capricious, an abuse of discretion, or otherwise not in

22  accordance with law.

**THIRD CLAIM FOR RELIEF**

**Violation of NEPA: Failure to Take a Hard Look at Project Environmental Impacts**

(On Behalf of All Plaintiffs)

26      132.    Plaintiffs re-allege, as if fully set forth herein, each and every allegation contained

27  in the preceding paragraphs.

28

133.    NEPA requires BLM to take a "hard look" at all reasonably foreseeable environmental impacts and adverse effects of the proposed drilling permits, including direct effects, indirect effects, and cumulative effects. *Robertson*, 490 U.S. at 349–50; 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1508.1.

134.    BLM failed to take a hard look at the direct, indirect, and cumulative impacts of the drilling permits, including on:

   (a)    Air quality;

   (b)    Greenhouse gas emissions;

   (c)    Groundwater quantity and quality;

   (d)    Human health and environmental justice communities.

135.    BLM's failure to disclose and adequately analyze the significant and adverse environmental impacts of its permit approvals is contrary to NEPA and its implementing regulations and therefore is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

**FOURTH CLAIM FOR RELIEF**

**Violation of NEPA: Failure to Consider Reasonable Alternatives**

(On Behalf of All Plaintiffs)

136.    Plaintiffs re-allege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

137.    Pursuant to NEPA, BLM must consider "alternatives to the proposed action." 42 U.S.C. § 4332(2)(C)(iii); *see also* 40 C.F.R. § 1502.14. BLM's duty to consider reasonable alternatives is operative even when impacts are not deemed significant. BLM must also consider reasonable alternatives "in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(H).

138.    By evaluating only the proposed action and a no action alternative, BLM failed to consider reasonable and viable alternatives to the approval of drilling permits, including alternatives such as a managed decline that would prevent or minimize the climate impacts of permit approvals.

139.   BLM's failure to identify and analyze reasonable and viable alternatives is contrary to NEPA and its implementing regulations and therefore is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

**FIFTH CLAIM FOR RELIEF**

**Violation of the Mineral Leasing Act**

(On Behalf of All Plaintiffs)

140.   Plaintiffs re-allege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

141.   Under the MLA, BLM must provide the public with the "terms" of a drilling permit as well as "maps or a narrative description of the affected lands," at least 30 days before issuing the permit. This information must include information regarding "other oil and gas leases already issued in the general area." 30 U.S.C. § 226(f).

142.   BLM's failure to provide the public with the "terms" of the six drilling permits or "maps or a narrative description of the affected lands," including information regarding "other oil and gas leases already issued in the general area" at least 30 days before issuing the permits, violates the MLA.

**SIXTH CLAIM FOR RELIEF**

**Violation of the Federal Land Policy and Management Act**

(On Behalf of All Plaintiffs)

143.   Plaintiffs re-allege, as if fully set forth herein, each and every allegation contained in the preceding paragraphs.

144.   Section 309(e) of FLPMA requires BLM to "give . . . the public adequate notice and an opportunity to comment upon . . . and to participate in . . . the management of[] the public lands." 43 U.S.C. § 1739(e).

145.   BLM's failure to give the public adequate notice and an opportunity to comment upon and to participate in the management of the public lands by failing to provide the public with adequate notice and opportunity to comment on the six drilling permits violates FLPMA.

1

**SEVENTH CLAIM FOR RELIEF**

2

**Violation of the Freedom of Information Act**

3

(On Behalf of Center for Biological Diversity)

4       146.    Plaintiff Center for Biological Diversity re-alleges, as if fully set forth herein, each

5    and every allegation contained in the preceding paragraphs.

6       147.    The Center has a statutory right to a lawful determination by BLM, in a manner

7    that complies with FOIA, on the Center's May 5, 2023 FOIA request. *See* 5 U.S.C. §

8    552(a)(6)(A)(i)(I).

9       148.    BLM violated Plaintiff's rights by failing to promptly disclose records that are

10   responsive to the Center's FOIA request beyond the deadlines that FOIA mandates. 5 U.S.C. §

11   552(a)(3)(A), (a)(6)(A)(i)(I), (a)(6)(C)(i).

12      149.    The Center's organizational activities will be adversely affected if BLM is allowed

13   to continue violating FOIA's deadlines.

14      150.    Unless enjoined and made subject to a declaration of the Center's legal rights by

15   this Court, BLM will continue to violate the Center's rights to receive public records under FOIA.

16

**REQUEST FOR RELIEF**

17      WHEREFORE, Plaintiffs respectfully request that this Court:

18      (a)    Declare that Defendants violated the CAA in approving the six drilling permits

19             for CRPC in the Mount Poso oil field in Kern County without undertaking a

20             conformity review;

21      (b)    Declare that Defendants violated NEPA, FLPMA, the MLA, and the APA in

22             approving the six drilling permits for CRPC in the Mount Poso oil field in

23             Kern County;

24      (c)    Vacate the EA, Decision Record, and Finding of No Significant Impact for

25             these six drilling permits;

26      (d)    Enjoin the drilling and pre-construction activities pursuant to these six drilling

27             permits;

28      (e)    Declare that Defendant BLM violated FOIA by failing to promptly disclose all

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                    28

1    records within FOIA's mandatory determination deadline;

2    (f)    Order BLM to produce documents responsive to Plaintiff Center for Biological

3    Diversity's FOIA request along with an index identifying any records or parts

4    thereof that it determines to be exempt from disclosure, along with the specific

5    exemption applied, should BLM determine that any responsive records are

6    exempt from disclosure;

7    (g)    Retain continuing jurisdiction of this matter until Defendants fully remedy the

8    violations of law complained of herein;

9    (h)    Award Plaintiffs their costs of litigation, including reasonable attorneys' fees

10    and costs, pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 and

11    the Clean Air Act, 42 U.S.C. § 7604(d); and

12    (i)    Grant Plaintiffs such additional relief as the Court may deem just and proper.

13

14    Respectfully submitted,

15    Dated: June 22, 2023    /s/ Radhika Kannan
    RADHIKA KANNAN (CA Bar No. 327733)
16    rkannan@earthjustice.org
    MICHELLE GHAFAR (CA Bar No. 315842)
17    mghafar@earthjustice.org
    Earthjustice
18    50 California Street, Suite 500
    San Francisco, CA 94111
19    Tel: (415) 217-2000 / Fax: (415) 217-2040

20    ELIZABETH B. FORSYTH
    (CA Bar No. 288311)
21    eforsyth@earthjustice.org
    Earthjustice
22    810 Third Avenue, Suite 610
    Seattle, WA 98104
23    Tel: (206) 531-0841 / Fax: (206) 343-1526

24    *Counsel for Plaintiffs*

25

26

27

28

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF                29