**MEMORANDUM IN SUPPORT**

**INTRODUCTION**

This case concerns the U.S. Bureau of Land Management's ("BLM or "the Agency") Decision Record approving six Applications for Permits to Drill ("APDs") in Kern County, California. The Decision Record authorizes Defendant California Resources Production Corporation ("the Corporation") to drill for oil on private lands containing BLM-administered mineral estate. After conducting environmental review under the National Environmental Policy Act ("NEPA") and an air emission analysis under the Clean Air Act ("CAA"), BLM approved the APDs.

Federal Defendants now seek voluntary remand to reevaluate certain analyses under NEPA and the CAA. This includes the project's cumulative effects on the environment, environmental justice impacts, and the air emission analysis. Federal Defendants request remand without vacatur in lieu of a merits decision to allow the Agency the opportunity to address its concerns in the first instance. Because the Corporation will not begin activities authorized under the APDs before August 2024, leaving the Decision Record in place during this narrow administrative process will not prejudice Plaintiffs.

Federal Defendants have conferred with the parties regarding this motion. Plaintiffs oppose this motion on the ground that the Decision Record should be vacated. The Corporation reserves its right to take a position until after it reviews Federal Defendants' brief.

## BACKGROUND

**I.   Legal Background**

    **A.  The National Environmental Policy Act**

When an entity applies for a permit to drill, BLM must evaluate the environmental effects of the permitting decision under NEPA.  NEPA serves the dual purpose of informing agency decision-makers of the significant environmental effects of proposed major federal actions and ensuring that relevant information is made available to the public so that they "may also play a role in both the decisionmaking process and the implementation of that decision." *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).  To meet the procedural goals of the statute, NEPA requires that an agency prepare a comprehensive environmental impact statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).

An EIS, however, is not required in every instance.  In accordance with the Council on Environmental Quality's regulations implementing NEPA, an agency should first determine the appropriate level of environmental review.  *See* 40 C.F.R. § 1501.3 (2020).  If an action typically would not have significant environmental effects, then it may be normally excluded from the requirement to prepare an EIS.  *Id.* § 1501.3(a)(2).

The purpose of an environmental assessment ("EA") is to assess the significance of the environmental effects and potential alternatives to achieving the agency's goals.  *See id.* § 1508.1(h).  An EA is a "concise public document" that describes the evidence and analysis supporting either a finding of no significant impact or that an EIS is required.  *Id.*  As part of the EA, the agency must analyze the "cumulative effects," or the "effects on the environment that result from the incremental effects of the action when added to the effects of other past, present,

and reasonably foreseeable actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." *Id.* § 1508.1(g)(3). A finding of no significant impact ("FONSI") means that the action "will not have a significant effect on the human environment" and therefore no EIS is required. *Id.* § 1508.1(l).

### A. The Clean Air Act

#### i. National Ambient Air Quality Standards and State Implementation Plans

The CAA, 42 U.S.C. §§ 7401–7671q, establishes a comprehensive program for controlling and improving the nation's air quality through both state and federal regulation. Among other requirements, the CAA requires EPA to establish National Ambient Air Quality Standards ("NAAQS") for certain common air pollutants, referred to as criteria pollutants. 42 U.S.C. §§ 7408, 7409. These NAAQS are designed to provide the requisite public health and welfare protection, consistent with section 109 of the CAA. *Id.* § 7409. Among others, EPA has established NAAQS for ozone and Particulate Matter ("PM"). *See* 40 C.F.R. §§ 50.13, 50.15.

Under the CAA, states have the primary responsibility for formulating pollution control strategies and ensuring that the ambient air in their jurisdictions meets the NAAQS for each pollutant, consistent with the CAA's requirements. 42 U.S.C. § 7407(a). Each state develops and establishes its comprehensive approach for attaining and maintaining the NAAQS in a state implementation plan ("SIP"), consistent with applicable statutory and regulatory requirements. *Id.* § 7410(a). Among other requirements, the SIP is required to include specific enforceable emission limitations and other measures necessary to attain and maintain the NAAQS, with additional requirements for each pollutant in a designated nonattainment area within a state. *Id.* §§ 7410(a)(1)–(2), 7502, 7511a. Every submission to revise the existing SIP must be adopted by the state and submitted to EPA for approval. *Id.* § 7410(a)(1)–(2), (l).

### ii. General Conformity Determinations for Nonattainment Areas

EPA designates geographic areas meeting a NAAQS for a particular criteria pollutant as attainment or unclassified, and areas not meeting the NAAQS (and nearby areas contributing to those violations) as nonattainment. *See id.* § 7407(d). For nonattainment areas, a federal agency must consider whether the proposed activity will conform to the SIP before approving the action—this decision is referred to as a "conformity determination." *Id.* § 7506(c); *see generally* 40 CFR, Part 93, Subpart B. To determine whether a general conformity determination is required, the agency first examines the impact of "total [] direct and indirect emissions" for the criteria pollutant(s) and their precursors at issue. 40 C.F.R. § 93.153(b). If the total of direct and indirect emissions at issue are *de minimis* (i.e., below the emissions rates identified by EPA regulation), then no general conformity determination is required for that criteria or precursor pollutant. *Id.* § 93.153(c)(1). If the emissions are equal to or exceed the regulatory rates the agency must prepare a general conformity determination before it can approve the project. *Id.* § 93.153(b).

## II. Factual Background

On July 15, 2022, the Corporation submitted six APDs to BLM seeking authorization to drill oil wells in Kern County. Garcia Declaration ("Garcia Decl.") ¶ 4; Ex. A, Decision Record at 1. Specifically, the Corporation sought to expand and grade five existing well pads and construct one additional pad, install associated power poles and pipelines, and drill six new wells on two existing leases within the 1926 Mount Poso oilfield. Garcia Decl. ¶ 4. BLM issued these leases in 1947 and 1968 for the underlying dominant federal mineral estate while the surface of the lease is privately owned ("split-estate"). *Id.* ¶¶ 6, 8. Kern County is part of the San Joaquin

Valley Air Pollution Control District that has been designated nonattainment for ozone, $PM_{10}$, and $PM_{2.5}$.[1]  *Id.* ¶ 12; Ex. C, EA at 5.

BLM conducted an EA under NEPA to analyze the potential environmental consequences of the project, including environmental justice concerns.  The EA also included a cumulative impact analysis that considered the incremental impacts of the projected life of drilling, production, and abandonment of the proposed wells (i.e., 30 years).  *Id.* at 42–50.  BLM concluded that there would be no cumulative impacts to water quality and quantity and paleontological resources, *id.* at 49–50, that cumulative impacts to biological and soil resources could be successfully mitigated, *id.* at 48, 50, and that marginal increases in air emissions were "too small to cause a significant change to existing health risks," *id.* at 43.

The EA also included BLM's calculation of the total direct and indirect emissions for ozone, $PM_{10}$, and $PM_{2.5}$ as required by the CAA.  *Id.* at 30.  BLM determined that the maximum estimated emissions from the six proposed wells were "well below the *de minimis* threshold for each criteria pollutant."  *Id.*  Because the emissions were expected to conform with the SIP, and therefore would not contribute to an exceedance of the NAAQS, BLM concluded that a conformity determination was not required.  *Id.*

Based upon the analysis in the EA and supporting documentation, BLM issued a FONSI and determined that no EIS was required.  Garcia Decl. ¶ 4; Ex. B, FONSI.  On May 31, 2023, BLM issued its Decision Record approving the six APDs.  Garcia Decl. ¶ 4; Ex. A, Decision Record.

---

[1]  $PM_{10}$ particulates have a diameter of 10 micrometers or smaller, while $PM_{2.5}$ particulates have a diameter of 2.5 micrometers or smaller.  See EPA Website on Particulate Matter.

**STANDARD OF REVIEW**

A request for voluntary remand without vacatur is subject to the equitable discretion of the court. *See, e.g.*, *Cal. Cmtys. Against Toxics v. EPA*, 688 F.3d 989, 992–94 (9th Cir. 2012) (weighing equitable factors in exercising discretion to remand to EPA without vacatur); *Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995).

**ARGUMENT**

Because BLM has identified concerns with the NEPA and CAA analyses underlying the challenged decision and BLM is undertaking a process to address those concerns, the Court should remand the Decision Record to the Agency to allow reconsideration through the administrative process. The Court should not vacate the Decision Record in the interim because it has not reached a decision on the merits; this motion seeks remand in lieu of a merits decision, to allow BLM to address its concerns in the first instance. Additionally, there is no risk of harm to the environment or undue prejudice to Plaintiffs because the Corporation will not proceed with the activities approved in the APDs before August 2024. Cochrane Declaration ¶ 5.

**I.    Remand is Appropriate to Allow BLM to Reexamine the Decision Record.**

Remand is appropriate here because BLM has identified concerns with the NEPA and CAA analyses underlying the Decision Record and seeks to reexamine its decision through the administrative process. Agencies have inherent authority to reevaluate past decisions and to revise, replace, or repeal initial actions. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983). Allowing for voluntary remand is consistent with this principle because "the power to decide in the first instance carries with it the power to reconsider." *Trujillo v. Gen. Elec. Co.*, 621 F.2d 1084, 1086 (10th Cir.1980).

In determining whether to grant a voluntary remand, courts within the Ninth Circuit have looked to the Federal Circuit's decision in *SKF USA v. United States* for guidance. *See, e.g.*, *Cal. Cmtys. Against Toxics*, 688 F.3d at 992; *N. Coast Rivers All. v. U.S. Dep't of the Interior*, No. 1:16-cv-307-LJO-MJS, 2016 WL 8673038, at *3 (E.D. Cal. Dec. 16, 2016). In *SKF USA*, the court indicated that, when an agency action is challenged, "the agency may request a remand, without confessing error, to reconsider its previous position." 254 F.3d 1022, 1028 (Fed. Cir. 2001); *see also Limnia, Inc. v. U.S. Dep't of Energy*, 857 F.3d 379, 387 (D.C. Cir. 2017). "Generally, courts only refuse voluntarily requested remand when the agency's request is frivolous or made in bad faith." *Cal. Cmtys. Against Toxics*, 688 F.3d at 992; *see also Rusty Coal Blackwater v. Sec'y of the Interior*, No. 3:14-cv-244-LRH-VPC, 2015 WL 506475, at *2 (D. Nev. Feb. 5, 2015). "[I]f the agency's concern is substantial and legitimate, a remand is usually appropriate." *SKF USA*, 254 F.3d at 1029.

BLM satisfies these requirements here. BLM's request is not frivolous, nor is it made in bad faith. Instead, remand is appropriate under BLM's inherent authority to reevaluate its own decisions. *Trujillo*, 621 F.2d at 1086. Here, a remand would enable the Agency to reevaluate "substantial and legitimate" issues in the EA. *SKF USA*, 254 F.3d at 1028. The Agency need not confess error to do so. *See N. Coast Rivers All. v. U.S. Dep't of Interior*, No. 1:16-CV-00307-LJO-MJS, 2016 WL 11372492, at *2 (E.D. Cal. Sept. 23, 2016) (finding that "refusal to admit wrongdoing is not dispositive" of whether the agency's request is made in good faith).

First, the cumulative effects and environmental justice analyses would benefit from further consideration. Garcia Decl. ¶ 19. Second, BLM wants to reexamine the methodology underpinning the air emission calculation. Garcia Decl. ¶¶ 16–18. After issuing the Decision Record, BLM discovered that the methodology used to calculate the project's direct and indirect

emissions differed from the standard used in California. *Id.* ¶¶ 15–16. The Agency applied the methodology used in other states such as Colorado, New Mexico, Utah, and Wyoming. *Id.* ¶¶ 14–15. BLM now seeks in good faith to apply the California standard on remand. *Id.* ¶ 18. Under these circumstances, where the agency seeks to reconsider important issues, remand is appropriate. *See Cal. Cmtys Against Toxics*, 688 F.3d at 992 (granting EPA's request for voluntary remand to allow the agency to better explain how emission offset credits would meet regulatory requirements and to reconsider its credit calculations).

On remand, BLM intends to undertake a specific administrative process that will take approximately six months from the date of this filing. Garcia Decl. ¶ 20. BLM will prepare supplemental NEPA analysis and CAA analysis as described above for the APD approvals. *Id.* The supplemental analysis will be noticed on the ePlanning website (as was the initial EA) in accordance with BLM policy, applicable regulations, and statutory authority. *See id.* Any public input received during the 30-day ePlanning notification period will be addressed by BLM, as appropriate, before BLM finalizes the analysis. *Id.* Upon completion of the supplemental analysis, BLM will decide whether to affirm its original decision, issue a new decision, or conduct additional NEPA analysis. *Id.*

In sum, permitting BLM to conduct this narrowly tailored administrative process will conserve the Court's and the parties' resources while allowing the Agency to exercise its inherent authority to reconsider its own decisions in the first instance.

**II.     The Court Should Remand the Challenged Decision Record Without Vacatur.**

In issuing a remand, courts retain discretion to fashion appropriate remedies. *See* 5 U.S.C. § 702 (nothing in the Administrative Procedure Act affects "the power or duty of the

court to dismiss any action or deny relief on any other appropriate legal or equitable ground"). Here, remanding without vacatur is appropriate for three reasons.[2]

First, Federal Defendants seek remand in lieu of a decision on the merits, and the Court lacks authority to order vacatur of an agency action without "first holding it unlawful." *In re Clean Water Act Rulemaking*, 60 F.4th 583, 596 (9th Cir. 2023). In a remand prior to a merits decision, a court has not yet found a violation of the law and therefore has no basis to vacate. *Id.*; *but see Nat. Res. Def. Council, Inc. v. U.S. Dep't of Interior*, 275 F. Supp. 2d 1136, 1143 (C.D. Cal. 2002) (considering the "seriousness" of the challenged agency action's "deficiencies" in determining whether to vacate before a merits decision). The Ninth Circuit recently reversed on these grounds, where the district court granted voluntary remand with vacatur over the U.S. Environmental Protection Agency's objection and before reaching the merits. *In re Clean Water Act Rulemaking*, 60 F.4th at 588–90. According to the Ninth Circuit, the Administrative Procedure Act forecloses "any authority of courts to vacate agency actions not first held unlawful." *Id.* at 594. Because Federal Defendants seek remand without vacatur, the Court need not reach the merits here.[3]

Second, even if this Court applies the equitable analysis normally used to decide whether to vacate agency action *after* a ruling on the merits, remand without vacatur is still the correct outcome. "Whether agency action should be vacated depends on how serious the agency's errors

---

[2] Federal Defendants note that some Justices on the Supreme Court have recently questioned whether vacatur is an available remedy under the APA at all. *See United States v. Texas*, 143 S. Ct. 1964, 1980–86 (2023) (Gorsuch, J., concurring). As explained in the text, however, the relief sought in this motion is consistent with currently controlling Ninth Circuit precedent.

[3] If this Court denies Federal Defendants' motion for voluntary remand without vacatur, Federal Defendants request the opportunity to address the merits as required by *In re Clean Water Act Rulemaking,* 60 F.4th at 596.

are and the disruptive consequences of an interim change that may itself be changed." *Cal. Cmtys Against Toxics*, 688 F.3d at 992 (quoting *Allied-Signal, inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146 (D.C. Cir. 1993)) (internal quotation marks omitted). In looking at the seriousness of the error, courts consider the likelihood that the agency will come to the same decision upon remand and whether the errors were "mere technical or procedural formalities." *Klamath–Siskiyou Wildlands Ctr. v. Nat'l Oceanic and Atmospheric Admin.*, 109 F. Supp. 3d 1238, 1244–45 (N.D. Cal. 2015); *see also Allied–Signal,* 988 F.2d at 151 (declining to vacate because there was "at least a serious possibility that the [agency would] be able to substantiate its decision on remand").

The Agency cannot prejudge the outcome on remand but believes that there is a "serious possibility" that it will reach the same conclusions on remand. *Allied–Signal,* 988 F.2d at 151. According to BLM's preliminarily calculations, when the California methodology is applied to the air emission analysis, the project's emissions remain below the *de minimis* threshold for the criteria pollutants at issue (obviating the need for a conformity determination). Garcia Decl. ¶ 18. As for cumulative impacts and environmental justice, BLM seeks to review and potentially expand upon its analysis, and it is possible that the revised analysis will support the same decision on remand. *See id.* ¶ 19. On the other side of the scale, vacatur would unnecessarily unravel months of consideration by the Agency, unchallenged analyses underpinning the EA, public scoping, and other agency processes that contributed to the initial decision. And it would force the Corporation to start from scratch on approved APDs that have not yet been ruled unlawful. Under these circumstances, where it is possible that the Agency will reach the same conclusion on remand and the disruptive consequences are potentially high, the decision should be left in place. *Allied–Signal,* 988 F.2d at 151.

Third, any prejudice to Plaintiffs stemming from a remand without vacatur is limited to a short delay in litigating the merits. The Corporation does not plan to begin construction activities or drilling before August 1, 2024 (Cochrane Decl. ¶ 5)—after the Agency anticipates concluding remand proceedings (Garcia Decl. ¶ 20). And the Corporation's proposed drilling activities are still under review with the California Department of Conservation, Geologic Energy Management Division. Cochrane Decl. ¶ 4. The Corporation does not intend to proceed with drilling activities while the State's review is pending. *Id.* Equally important, BLM will conduct supplemental analysis for the APD approvals precisely to ensure compliance with NEPA and the CAA, as Plaintiffs themselves seek in their Complaint. *See* ECF No. 1 at 24–27.

At bottom, leaving the Decision Record in place would serve the interests of regulatory efficiency and judicial economy by allowing BLM to address known issues in the EA without prematurely reaching the merits in the litigation or unduly prejudicing Plaintiffs.

**CONCLUSION**

For these reasons, the Court should grant Federal Defendants' motion for voluntary remand without vacatur and hold the case in abeyance pending remand proceedings.

DATED: November 7, 2023

TODD KIM
Assistant Attorney General
U.S. Department of Justice
Environment and Natural Resources Division

By: */s/ Lucy E. Brown*
LUCY E. BROWN
Environmental Defense Section
DUSTIN J. WEISMAN
Natural Resources Section

PHILLIP A. TALBERT
Acting United States Attorney
RACHEL R. DAVIDSON
Assistant United States Attorney

*Attorneys for Federal Defendants*