UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>U.S. BUREAU OF LAND MANAGEMENT, *et al.*,<br><br>Defendants. | Case No.   1:23-cv-00938-JLT-CDB<br><br>ORDER GRANTING PLAINTIFFS' MOTION FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT<br><br>(Docs. 52, 58) |

Pending before the Court is the motion of Plaintiffs[1] Center for Biological Diversity ("Center"), The Wilderness Society ("TWS"), Friends of the Earth ("FOE"), and Sierra Club (collectively, "Plaintiffs") for leave to file a second amended complaint, filed on October 8, 2024. (Doc. 58). Defendant Innex California, Inc. ("Innex") filed an opposition to the motion on October 31, 2024. (Doc. 62). That same day, Defendant California Resources Production Corporation ("CRPC") filed a notice of non-opposition to the motion and stated therein it "reserves all rights to challenge the adequacy of the proposed [SAC] under the Federal Rules of Civil Procedure and otherwise." (Doc. 65) Federal Defendants U.S. Bureau of Land Management ("BLM"), Debra Haaland, Karen Mouritsen, Gabriel Garcia, and John Hodge (collectively, "Federal Defendants")

---

[1] Plaintiff Natural Resources Defense Council was terminated from this action on July 1, 2024, following the Court's grant of Plaintiffs' unopposed first motion to amend the complaint. (Doc. 38).

1

filed a response to the motion stating they "take no position on Plaintiffs' second motion to amend" and although they filed an answer to Plaintiffs' first amended complaint, instead of moving to dismiss at that time, they "made clear that they may raise Plaintiffs lack of standing as a defense" and "reserve the right to raise this defense" (Doc. 63). Plaintiffs replied to Innex's opposition on November 8, 2024. (Doc. 66). The Court turns to the pending motion below.

## I. Relevant Background

Plaintiffs initiated this action with the filing of a complaint seeking declaratory and injunctive relief against Defendants on June 22, 2023. (Doc. 1). On July 1, 2024, the Court granted Plaintiffs' unopposed motion to amend and supplement the complaint. (Doc. 38). Plaintiffs filed the operative, first amended complaint ("FAC") on July 8, 2024. (Doc. 40). Plaintiffs challenge BLM's approval of drilling permits for new oil wells on public land in the San Joaquin Valley, California, without accounting for the air quality, groundwater, public health, and climate impacts of BLM's continued expansion of oil and gas drilling, and without providing for meaningful input from the communities most impacted by its permitting decisions. (*Id.* ¶ 1). Plaintiffs allege BLM's failures violates the Clean Air Act ("CAA"), 42 U.S.C. §§ 7041 *et seq.*, the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, the Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701 *et seq.*, and the Mineral Leasing Act ("MLA"), 30 U.S.C. §§ 181 *et seq*. (*Id.* ¶ 2).

Federal Defendants and CRPC filed their respective answers to the FAC on August 27, 2024. (Docs. 50, 51). That same day, Innex filed its pending motion to dismiss the FAC for lack of jurisdiction, moving to dismiss all of Plaintiffs' claims related to BLM's approval of four drilling permits ("APDs") to Innex on private land in the Kettleman Middle Dome oilfield, on the grounds that Plaintiffs lacked Article III standing. (Doc. 52). Plaintiffs thereafter filed the pending motion for leave to file a second amended complaint. (Doc. 58).

## II. Governing Authority

Rule 15 provides that a plaintiff may amend the complaint only by leave of the court or by written consent of the adverse party if the amendment is sought more than 21 days after the filing of a responsive pleading or a motion to dismiss. Fed. R. Civ. P. 15(a). "Rule 15(a) is very liberal"

2

and a court should freely give leave to amend when "justice so requires." *AmerisourceBergen Corp. v. Dialysist West, Inc.*, 465 F.3d 946, 951 (9th Cir. 2006); *see Chodos v. W. Publ. Co.*, 292 F.3d 992, 1003 (9th Cir. 2002) ("it is generally our policy to permit amendment with 'extreme liberality'") (quoting *Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990)).

Granting or denying leave to amend a complaint under Rule 15 is within the discretion of the court. *Swanson v. United States Forest Service*, 87 F.3d 339, 343 (9th Cir. 1996). "In exercising this discretion, a court must be guided by the underlying purpose of Rule 15 to facilitate decision on the merits, rather than on the pleadings or technicalities." *United States v. Webb*, 655 F.2d 977, 979 (9th Cir, 1981); *Chudacoff v. Univ. Med. Ctr.*, 649 F.3d 1143, 1152 (9th Cir. 2011) ("refusing Chudacoff leave to amend a technical pleading error, albeit one he should have noticed earlier, would run contrary to Rule 15(a)'s intent.").

A court ordinarily considers five factors to assess whether to grant leave to amend: "(1) bad faith; (2) undue delay; (3) prejudice to the opposing party; (4) futility of amendment; and (5) whether the plaintiff has previously amended his complaint." *Nunes v. Ashcroft*, 375 F.3d 805, 808 (9th Cir. 2004). The factors are not weighed equally. *Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995); *see Atkins v. Astrue*, No. C 10–0180 PJH2011 WL 1335607, at *3 (N.D. Cal. Apr. 7, 2011) (the five factors "need not all be considered in each case"). Undue delay, "by itself…is insufficient to justify denying a motion to amend." *Bowles v. Reade*, 198 F.3d 752, 758 (9th Cir. 1999). On the other hand, futility of amendment and prejudice to the opposing party can, by themselves, justify the denial of a motion for leave to amend. *Bonin*, 59 F.3d at 845; *see Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (the consideration of prejudice to the opposing party carries the greatest weight).

In conducting this five-factor analysis, the court generally grants all inferences in favor of permitting amendment. *Griggs v. Pace Am. Group, Inc.*, 170 F.3d 877, 880 (9th Cir. 1999). Moreover, the court must be mindful that, for each of these factors, the party opposing amendment has the burden of showing that amendment is not warranted. *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 187 (9th Cir. 1987).

### III. Discussion

As characterized by Plaintiffs, the proposed SAC (Doc. 58-1) "adds allegations concerning Plaintiffs' and their members' interests and injuries and adds the Sierra Club as a plaintiff in this case." (Doc. 58 at 2). According to Plaintiffs, the proposed amendment "incorporates extensive standing allegations from [six] declarations concurrently filed by Plaintiffs on behalf of their organizations and members" in response to Innex's pending motion to dismiss that "would otherwise be provided at a later stage with the intent for these amendments to resolve all standing concerns and avoid further motions practice regarding standing." (*Id.*). Plaintiffs contend none of the four relevant factors in considering its motion—bad faith, undue delay, prejudice, or futility—support a denial of its motion. (Doc. 58 at 2-3). Plaintiffs argue the amendments are not futile "because they provide additional information that is relevant for the merits stage" and that "to the extent there were any deficiencies in the [FAC] with regard to Plaintiffs' standing allegations, the amendments contained in the proposed [SAC] cure those deficiencies and accordingly should be allowed." (*Id.* at 3).

Innex contends Plaintiffs' motion to amend should be denied as futile. (Doc. 62 at 5). Innex argues that Plaintiffs fail to defend the adequacy of their FAC from its motion to dismiss on the grounds that Plaintiffs lacked Article III standing, and that Plaintiffs "try to avoid dismissal by seeking leave to file a [SAC]" to add allegations concerning perceived injuries of its members and to add Sierra Club as a Plaintiff. (*Id.*). The crux of Innex's opposition is that Plaintiffs fail to meet its burden in establishing standing to support its claims as they fail to allege any geographic connection to Innex's approval of four drilling permits ("APDs") and therefore amendment should be denied as futile. (*Id.*).

Because futility of amendment is the dispositive *Nunes* factor here, the Court focuses its analysis on that factor. A court may deny leave to amend if the proposed amendment is futile or would be subject to dismissal. *Carrico v. City & Cnty. of San Francisco*, 656 F.3d 1002, 1008 (9th Cir. 2011). An amendment is futile if the complaint clearly could not be saved by amendment. *United States v. Corinthian Colleges*, 655 F.3d 984, 995 (9th Cir. 2011). However, denial of leave to amend on futility grounds is "rare." *Zurich Am. Ins. Co. of Illinois v. VForce Inc.*, No. 2:18-cv-

4

1  02066-TLN-CKD, 2020 WL 2732046, at *3 (E.D. Cal. May 26, 2020) (citing *Netbula, LLC v.*
2  *Distinct Corp.*, 212 F.R.D. 534, 539 (N.D. Cal. 2003)). "Ordinarily, 'courts will defer consideration
3  of challenges to the merits of a proposed amended pleading until after leave to amend is granted
4  and the amended pleading is filed.'" (*Id.*).

5      The Court reviews Plaintiffs' proposed amendments and declarations filed in support of the
6  proposed SAC to determine if the proposed amendments are futile or would be subject to dismissal.
7  Specifically, the Court determines whether the proposed SAC establishes Article III standing to
8  support Plaintiffs' claims such that amendment should be granted.

9      **A.    Proposed Plaintiff Sierra Club and Declarations in Support of the SAC**

10      As noted above, the proposed SAC "adds the Sierra Club as a plaintiff in this case" and
11  "incorporates extensive standing allegations from declarations concurrently filed by Plaintiffs on
12  behalf of their organizations and members." (Doc. 58 at 2). The Court summarizes allegations
13  involving proposed Plaintiff Sierra Club and the six declarations filed in support of the SAC below.

14      1.    <u>Proposed Plaintiff Sierra Club</u>

15      The proposed SAC names Sierra Club as a Plaintiff and describes it as a "national nonprofit
16  organization" with a "Kern-Kaweah Chapter, which includes Kern and Kings counties, [that] has
17  over 980 members" and that "Sierra Club brings this action on its own behalf and on behalf of its
18  adversely affected members." (Doc. 58-1 ¶ 39). Plaintiffs allege Sierra Club "pursues [its]
19  objectives nationwide, including in California and the Bakersfield Office region, by working to
20  protect communities and lands administered by the federal government from the harmful impacts
21  of oil and gas development, including air and climate pollution." (*Id.* ¶ 40). Plaintiffs allege one
22  of Sierra Club's "core activities is to challenge BLM's land use planning and oil and gas decision-
23  making, including in the Bakersfield Field Office region." (*Id.* ¶ 41). Plaintiffs allege Sierra Club
24  "has individual members, including William Krend, who live, visit, work, or recreate in the
25  Bakersfield Field Office region in Kern and Kings counties" and these members have "specific
26  intentions to continue to interact with these areas frequently and on an ongoing basis[,]" and their
27  "enjoyment of these activities is heavily dependent on the heath and protection of the surrounding
28  environment." (*Id.* ¶ 44). Plaintiffs allege that if their "challenge to the drilling permits is

1  successful, Mr. Krend will not have to suffer from increased air pollution that affects his and his
2  family's ability to safely breathe and recreate in this region, and he will be better able to participate
3  in BLM's decision-making process." (*Id.* ¶ 45).

4             2.      Declaration of Ileene Anderson (Doc. 58-4) ("Anderson Decl.")

5  Ileene Anderson declares that she resides in Los Angeles, California, and is a member of
6  the Center since 1999. (Anderson Decl. ¶¶ 2, 5). She works out of the greater Los Angeles area in
7  her employment with the Center. (*Id.* ¶ 6). She declares that the Center's members, including
8  herself, "enjoy and use federal land in Southern and Central California, including land and natural
9  resources managed by the [BLM's] Bakersfield Field Office[,]" and from whom they "expect and
10 rely upon … to protect air and water quality, species, habitats, and viewsheds of these lands." (*Id.*
11 ¶ 10). She declares that "[o]ur members' enjoyment of the public land is diminished by poor air
12 quality in the area." (*Id.*). She declares she has "strong personal interests in the public lands in the
13 Central and San Joaquin Valley" as she "grew up in Bakersfield and have family members and
14 friends who still live there, and who [she] visits several times each year." (*Id.* ¶ 18). She declares
15 she "regularly recreate and observe plants and wildlife on [the] public lands ... including lands that
16 are within the area that is the subject of the [BLM's] 2014 Resource Management Plan" including
17 "Temblor Range, and west side of the San Joaquin Valley, the Bitter Creek National Wildlife
18 Refuge and surrounding areas, and publicly accessible areas along Poso Creek, among others." (*Id.*
19 ¶ 19). She declares she "visited some of these areas in spring 2023 to look for plants and animals."
20 (*Id.*). She declares she has "visited and will continue to visit public lands and natural resources
21 within and managed by the Bakersfield Field Office that would be directly or indirectly affected by
22 oil and gas drilling approved by the [BLM]." (*Id.*). She declares that Poso Creek "runs about a
23 mile and a half to two miles from the CACA004999 (Rench) lease where some of the APD wells
24 at issue in this case will be drilled" and that she has "enjoyed walking up Poso Creek … looking
25 for birds and plants[.]" (*Id.* ¶ 23). She declares the "APDs in the CAS019301C (Alta Vedder)
26 lease will be further away from Poso Creek but are within an area that is within the San Joaquin kit
27 fox's recovery area" which she "keep[s] a shar eye out for[.]" (*Id.* ¶¶ 22, 24). She declares she is
28 also "concerned about impacts of oil and gas drilling in this area on the critically endangered

1  California condor and [her] ability to view condors … in the area." (*Id.* ¶ 25). She declares "the
2  impacts to condors in and around oil fields" may "lessen [her] ability to view condors in the areas
3  [she] visit[.]" (*Id.*). She declares that a "court order declaring the [BLM] violated NEPA and other
4  federal laws, vacating the permits, and preventing any drilling on these APDs until BLM complies
5  with the law would redress the injuries to the Center, its members, and [herself]." (*Id.* ¶ 31).

6                    3.    Declaration of Francisco Gonzalez (Doc. 58-5) ("Gonzalez Decl.")

7  Francisco Gonzalez declares that he has lived in Arvin, California, for 20 years, is a member
8  of the Center, and lives "near BLM land." (Gonzalez Decl. ¶¶ 2-3, 6). He "frequently engage[s]
9  in outdoor activities that include going to public lands to hike and walk" and is a "frequent visitor
10 to the Temblor Hills area, the Bitter Creek National Wildlife Refuge, Poso Creek, Los Padres
11 National Forest, Chimineas Ranch, and the Cuyama Valley" with Poso Creek and Chimineas Ranch
12 as the "area[s] that [he] visits the most[.]" (*Id.* ¶¶ 6, 7). He declares he visits Poso Creek "to verify
13 that there are no leaks due to oil and gas drilling that are harming the water and community[,]" and
14 also "with family and neighbors to hike and walk around" with his "last visit mid-September 2024,
15 and [he] plan[s] to visit again in the upcoming weeks before the weather changes." (*Id.* ¶ 8). He
16 is "concerned about the negative impacts on our communities when it comes to oil and gas" and
17 "about the air quality and the impact of the constant flaring of gas in oil fields, including right
18 across the street from Arvin High School." (*Id.* ¶ 9). He declares an "increase in oil and gas drilling
19 will also bring a lot of noise and truck traffic into this area and will cause chaos in our community"
20 as the "increased traffic makes air quality worse" and the "trucks emit so much pollution and drive
21 through our communities." (*Id.* ¶ 12). He declares what most concerns him "is the possible and
22 most likely poisoning of our community due to the explosion of tanks or leaks of volatile organic
23 compounds that can cause serious damage to our community." (*Id.* ¶ 14).

24                   4.    Declaration of Daniel Rossman (Doc. 58-6) ("Rossman Decl.")

25 Daniel Rossman declares that he joined the staff of TWS in 2008 and as of September 30,
26 2024, he is "no longer a TWS employee" but continues "to support its work to ensure that our
27 federal public lands are safeguarded for future generations" and that he "remains an active TWS
28 member." (Rossman Decl. ¶¶ 2, 3). He declares he lives in Pasadena, California, and "occasionally

travel[s] for both work and pleasure to visit and recreate on public lands in and around Kern and Kings Counties." (*Id.* ¶ 6). He declares that if "BLM's approvals of the APDs at issue in this case are allowed to stand, TWS members and affected communities in the area of these permits will experience worsened air and water quality and be less likely to safely live and recreate in he California southern Central Coast and Central Valle regions that TWS works to protect[.]" (*Id.* ¶ 18). He declares the "relief sought by plaintiffs, including TWS, in this action—declaring BLM violated NEPA, the Clean Air Act, and other laws in approving the permits at issue, vacating the EAs and FONSIs approving them, and enjoining any drilling activity pursuant to the CRPC and INNEX APDs until BLM fully complies with federal laws—will remedy the injury to TWS, TWS members, local communities, and the public at large, including [himself]." (*Id.* ¶ 29).

5. <u>Declaration of Hallie Templeton (Doc. 58-7) ("Templeton Decl.")</u>

Hallie Templeton declares that she is the legal director for FOE, which has "nine active members living in the area managed by the Bakersfield Field Office." (Templeton Decl. ¶¶ 2, 4). She declares that FOE's "members and activists have used, currently use, and will continue to use public lands and natural resources, including affected areas in the Bakersfield Field Office area[,]" and the communities in this area "have suffered significantly degraded air quality … from activities like oil and gas drilling." (*Id.* ¶ 15). She declares that should "the challenged APDs be affirmed, BLM's decision will directly impact [FOE's] work" and harm its "interests, as well as those of its members and advocates." (*Id.* ¶ 17). She declares the "relief sought by Plaintiffs, including [FOE] … will remedy the injury to [FOE], our members, local San Joaquin Valley communities and ecosystems, and the public impacted by BLM's decisions." (*Id.* ¶ 18).

6. <u>Declaration of Tracy McCowan (Doc. 58-8) ("McCowan Decl.")</u>

Tracy McCowan declares that she currently resides "in the Oildale community in Bakersfield, California, near the lands managed by [BLM's] Bakersfield Field Office[,]" has "lived in Bakersfield since January 2022[,]" and works in Kern County as a librarian at the Wasco State Prison "about 30 miles north of [her] home." (McCowan Decl. ¶ 2). She declares that she has been a member of FOE since 2017. (*Id.* ¶ 3). She declares that "[l]iving in an area with such excessive pollution — largely due to oil and gas drilling — takes a toll on the pride [she has] in [her] home

1  and community" and that "[i]ncreased drilling will only make" her daily walks outdoors "nearly
2  impossible." (*Id.* ¶¶ 5, 7). She declares "increased drilling activity in the area" will affect her
3  immunocompromised partner's ability to enjoy life, "let alone breathe safely[.]" (*Id.* ¶ 8). She
4  declares "[m]ore oil and gas activity in our region will only worsen [her] air and water quality,
5  harm [her] and [her] partner's health, add more eye sores to our skyline, and lock in additional dirty
6  development in our already depleted community." (*Id.* ¶ 12). She declares that "[s]hould this
7  litigation succeed in preventing drilling activity at these new wells while the federal government
8  properly fulfills its mandates under the [NEPA, CAA,] and other federal laws," she is "confident
9  that these harms will be slowed if not stopped altogether[.]" (*Id.* ¶ 14).

10              7.        Declaration of William Krend (Doc. 58-9) ("Krend Decl.")

11  William Krend declares that he currently lives in Lemoore, California, "near the lands
12  managed by [BLM's] Bakersfield Field Office in Kings County" and that he has lived here since
13  1972. (Krend Decl. ¶ 2). He declares that he is a lifetime member of Sierra Club. (*Id.* ¶ 5). He
14  declares that he spends "a lot of [his] time in and around Lemoore and the San Joaquin Valley and
15  am active in [his] community" as he "enjoy[s] hiking near [his] home" and has "taken hiking trips
16  through the Sierra Nevada Mountains, Yosemite, and Mount Whitney." (*Id.* ¶ 7). He declares he
17  "still ha[s] friends in Avenal and return to visit them at least two to three times every year[,]" often
18  stops "in Kettleman City during trips to the Central Coast or other parts of the San Joaquin
19  Valley[,]" and enjoys "stopping for dinner at the nearby Harris Ranch" which he has "already
20  visited numerous times this year." (*Id.* ¶ 8). He declares that when he "lived in Avenal in the early
21  1970's, [he] lived at the base of Kettleman Hills and the oil and gas drilling that took place
22  there … which was incredibly concerning to [him]" and that he "still live[s] near this area now and
23  worry about the impact of this pollution on [him] and [his] family." (*Id.* ¶ 12). He declares "[i]f
24  the Valley had clean air, without multiple polluting facilities including oil and gas wells making it
25  harder to breathe and appreciate our natural resources, [he] would hike more often in this area and
26  feel more comfortable spending time outdoors in [his] community." (*Id.* ¶ 15). He declares that
27  the "relief that Plaintiffs, including Sierra Club, are seeking in this case … will remedy the injury
28  to [him], Sierra Club, other San Joaquin Valley residents, and the public." (*Id.* ¶ 17).

B.  **Standing as an Environmental Plaintiff**

Federal courts are courts of limited jurisdiction, possessing "only that power authorized by the Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Under Article III, federal courts may hear only actual cases or controversies. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006); *see* U.S. Const. art. III, § 2, cl. 1. The case or controversy requirement demands that "[i]n every federal case, the party bringing the suit must establish standing to prosecute the action." *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004) (abrogated on other grounds by *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014)).

It is an "essential and unchanging part of the case-or-controversy requirement" that a plaintiff seeking to sue in federal court must establish Article III standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). For a plaintiff to have standing, there must be: (1) "an injury in fact—a harm suffered by the plaintiff"; (2) "causation—a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant"; and (3) "redressability—a likelihood that the requested relief will redress the alleged injury." *Steel Co v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998) (citation omitted).

"Article III grants federal courts the power to redress harms that defendants cause plaintiffs, not a freewheeling power to hold defendants accountable for legal infractions." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 427 (2021) (citation omitted). "Only those plaintiffs who have been concretely harmed by a defendant's statutory violation may sue that private defendant over that violation in federal court." *Id.* Plaintiffs may establish standing to challenge environmental harms by alleging "that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Friends of the Earth, Inc. v. Laidlaw Env't. Servs.*, 528 U.S. 167, 183 (2000) (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)). The Ninth Circuit has explained that "evidence of a credible threat to the plaintiff's physical well-being from airborne pollutants falls well within the range of injuries to cognizable interests that may confer standing." *Hall v. Norton*, 266 F.3d 969, 976 (9th Cir. 2001); *see Sierra Club v. EPA*, 762 F.3d 971, 977 (9th Cir. 2014).

10

An entity may establish organizational standing if it alleges "concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's activities—[that] constitutes far more than simply a setback to the organization's resources." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). An organization "that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 394 (2024)).

Because Plaintiffs do not argue in their filings whether they have associational[2] standing over their claims, the Court undertakes its standing analysis in determining whether the individual Plaintiffs, through the declarations attached to the proposed SAC, may establish standing under the above framework.

**C.   Analysis**

Plaintiffs argue that their proposed SAC adds "extensive additional details regarding Plaintiffs' standing" that "add[s] specificity far beyond that required at the pleadings stage[.]" (Doc. 66 at 2). Plaintiffs contend that the proposed amendments allege that "members of Plaintiffs' organizations will be harmed by [BLM's] approval of oil wells challenged in this case—including INNEX's—because air pollution from these wells will directly impact Plaintiffs' members." (*Id.*). Plaintiffs therefore contend Innex's arguments regarding standing—that "Plaintiffs' members are too far from the wells, or that their wells' emissions are too small to impact Plaintiffs' members"—are arguments "inextricably intertwined with the merits" of the case such that it is "inappropriate to decide at this juncture." (*Id.*). Further, Plaintiffs contend Innex fails to address Ninth Circuit precedent that establishes "that evidence of a credible threat to the plaintiff's physical well-being from airborne pollutants" establishes an injury-in-fact sufficient to confer standing. (*Id.*) (citing *Ass'n of Irritated Residents v. U.S. EPA*, 10 F.4th 937, 943 (9th Cir. 2021)). Plaintiffs also contend

---

[2] Under the associational standing doctrine, an entity may show injury by establishing that "(a) its members [or any one of them] would otherwise have standing to sue in their own right; (b) the interests [the entity] seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *United Food and Com. Workers Union Local 751 v. Brown Grp.*, 517 U.S. 544, 553 (1996) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

11

1    they have adequately alleged organizational standing. (*Id.* at n. 1).

2        Innex contends that the proposed SAC is futile because it does not allege a cognizable injury-in-fact, specifically in failing to show that the individual members use the area affected by the challenged activity and not an area roughly in the vicinity of a project site. (Doc. 62 at 10). Innex contends that the member declarations annexed to the proposed SAC fail to assert a geographic nexus to any specific wells or drilling sites. (*Id.* at 13). Innex contends that Plaintiffs' air quality concerns do not establish standing because the allegations thereto "do not have anything to do with [its] permits[,]" fail to connect the generalized grievances to the APDs at issue, and the health impacts are "speculative." (*Id.* at 15-17). Innex contends Plaintiffs fail to establish organizational standing because the proposed SAC fails to allege facts demonstrating standing for the organizational Plaintiffs to sue on their own behalf. (*Id.* at 19).

    In *Ass'n of Irritated Residents*, the Ninth Circuit found that the association established injury-in-fact required for Article III standing because the association's members submitted "declarations containing credible allegations of respiratory distress as well as harm to their recreational and aesthetic interests as a result of ozone pollution in the [San Joaquin] Valley." *Ass'n of Irritated Residents*, 10 F.4th at 943. The Ninth Circuit explained that an injury is fairly traceable to a challenged action as long as the links in the proffered chain of causation are not hypothetical and remain plausible and that the redressability requirement can be met by showing that "it is likely, although not certain, that [a plaintiff's] injury can be redressed by a favorable decision." (*Id.* at 944). In finding that neither part of the test "demands absolute certainty," the Ninth Circuit found both parts of the test satisfied. (*Id.*). The Ninth Circuit found that the threat that the Valley faced— in continuing to fail to meet the ozone standard under the EPA such that "the contingency measure [at issue] will be activated—was neither conjectural nor hypothetical" and instead "a reasonable inference from the historical record" in making its determination that an injury-in-fact had been alleged. (*Id.*).

    Here, the Court finds that the declarations in the proposed SAC likewise contain credible allegations of respiratory distress as well as harm to [the] recreational and aesthetic interests" of the individual Plaintiffs as a result of the air pollution in the San Joaquin Valley that will be

1  exacerbated by BLM's unlawful approval of the APDs at issue. *See Ass'n of Irritated Residents*,
2  10 F.4th at 943; (Doc. 66 at 8-9). For example, Krend alleges that he lives "near the lands managed
3  by [BLM's] Bakersfield Field Office in Kings County" and that "BLM's approvals of new oil and
4  gas wells near Bakersfield and Kettleman City … add[s] more emissions of dangerous pollutants
5  that prevent [him] and other local residents from safely enjoying the place where [they] live."
6  (Krend Decl. ¶¶ 2, 14). Further, McCowan alleges that that "[i]ncreased drilling will only make"
7  her daily walks outdoors "nearly impossible[,]" that it will affect her immunocompromised
8  partner's ability to enjoy life, "let alone breathe safely[,]" and that"[m]ore oil and gas activity in
9  our region will only worsen [her] air and water quality, harm [her] and [her] partner's health, add
10 more eye sores to our skyline, and lock in additional dirty development in our already depleted
11 community." (*Id.* ¶¶ 7-8, 12).

12  Additionally, the Court finds the proposed SAC contains allegations sufficient to
13 demonstrate that the amendments regarding organizational standing are not futile. Plaintiffs have
14 alleged facts throughout the proposed SAC showing that its organizations' "core activities are
15 directly affected by [Innex's] conduct[,]" such as in the allegations and declarations establishing
16 that participating in decision-making processes related to oil and gas drilling are core business
17 activities of the organizations, and BLM's unlawful issuance of APDs without public notice harms
18 the organizations' ability to participate. *See Havens Realty Corp.*, 455 U.S. at 379; *see* (Doc. 58-1
19 ¶¶ 18-19, 26-29, 31-33, 36, 41-43).

20  Because Plaintiffs have shown the proposed amendments to the operative complaint are not
21 futile — meaning it is not clear the complaint is unsavable by the proposed amendments (*see*
22 *Corinthian Colleges*, 655 F.3d at 995) — and granting all inferences in favor of permitting
23 amendment, the Court finds that granting Plaintiffs leave to amend to file the SAC is warranted.
24 *Griggs*, 170 F.3d at 880; *see Miller v. Rykoff-Sexton, Inc*., 845 F.2d 209, 214 (9th Cir. 1988)
25 (proposed amendment is futile "only if no set of facts can be proved under the amendment to the
26 pleadings that would constitute a valid and sufficient claim or defense.").
27 ///
28 ///

## IV. CONCLUSION AND ORDER

For the reasons set forth above, **IT IS HEREBY ORDERED** that:

1. Plaintiffs' motion for leave to file a second amended complaint (Doc. 58) is GRANTED;
2. Within seven (7) days of entry of this order, Plaintiffs shall file the proposed second amended complaint (Doc. 58-1) as a standalone docket entry; and
3. Within 14 days of Plaintiffs' filing of the second amended complaint, Defendants shall file their responsive pleadings (*see* Fed. R. Civ. P. 15(a)(3)).

IT IS SO ORDERED.

Dated: __April 1, 2025__       _____
UNITED STATES MAGISTRATE JUDGE

14